UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **FIRST INVESTORS NEVADA REALTY, LLC, as agent for FIRST INVESTORS NEVADA REALTY TRUST,** assignee of **MARK HANKIN,** and **HANMAR ASSOCIATES, MLP**, | JURY TRIAL DEMANDED |
| *Plaintiffs,* | |
| v. | NO. _____ |
| **EIS, INC., EIS LEGACY, LLC, EIS BUYER, LLC,** and **AUDAX MANAGEMENT COMPANY, LLC**, | |
| *Defendants.* | |

# COMPLAINT

Plaintiffs, First Investors Nevada Realty, LLC as agent for First Investors Nevada Realty Trust, assignee of Mark Hankin ("First Investors"), and HanMar Associates, MLP ("HanMar"; together, "Landlord") bring this Complaint against Defendants EIS, Inc. ("EIS"), EIS Legacy, LLC ("Legacy"), EIS Buyer, LLC ("Buyer"), and Audax Management Company, LLC ("Audax"; collectively, "Defendants"), and, in support thereof, aver as follows:

## PRELIMINARY STATEMENT

1. Pursuant to a written lease agreement, as amended, Landlord leased an industrial property to Cobra Wire and Cable, Inc. ("Cobra") and EIS, Inc. (collectively "EIS"), fabricators and distributors of wire and cable.[1]

2. Following numerous extensions, the then-current lease term ended on March 31, 2017. Landlord then discovered that EIS had, in violation of its express contractual obligations,

---

[1] EIS agreed to become the tenant and to assume all of Cobra's obligations under the Lease pursuant to Addendum #4, dated January 18, 2012.

1

failed to properly maintain the premises and to properly restore it to the condition required under the Lease.

3.      On April 5 2017, Landlord filed a claim with the American Arbitration Association styled *First Investors Nevada Realty, LLC as agent for First Investors Nevada Realty Trust, assignee of Mark Hankin and HanMar Associates, MLP v. EIS, Inc. and Cobra Cable and Wireless, Inc.*, AAA Case No. 01-17-0001-9713 (the "Arbitration"). Cobra is the defunct predecessor entity which merged with and into EIS. The Arbitration is still pending against EIS.

4.      In 2019, after years of protracted arbitration and during the arbitration, EIS quietly sold its assets or was otherwise acquired by Audax through a series of transactions. EIS refused to disclose the details of the transactions to Landlord.

5.      However, Landlord has managed to learn the basic structure of the transfers. On information and belief, in a going-private transaction, EIS converted from a corporation to a limited liability company, Legacy. Legacy then transferred its assets and/or stock to Buyer, which is owned and controlled by Audax (collectively, the "Transfers").

6.      Thus, Audax is the ultimate successor entity to EIS, as evidenced by the press release that it issued on September 30, 2019, declaring that it had completed its acquisition of EIS.

7.      As successor entities, Legacy, Buyer, and Audax are liable for EIS' breaches of contract under a theory of successor liability.

8.      Furthermore, Defendants have engaged in a series of transfers with the intent to hinder, delay, or defraud Landlord and EIS' other creditors. It is unclear if EIS even still exists –

there is no registered corporate entity with that name – but if EIS does exist, it has been rendered insolvent by the Transfers.

9. Landlord brings its breach of contract claims under a theory of successor liability and under Pennsylvania's Uniform Voidable Transactions Act, 12 Pa.C.S. § 5101 *et seq.* ("PUVTA"), to void the transactions.

## THE PARTIES

10. First Investors is a Delaware limited liability company with an address of 65 Permanent School Road, Erwinna, Pennsylvania 18920. First Investors is a citizen of Pennsylvania as all of its members are citizens of Pennsylvania.

11. HanMar is a Pennsylvania master limited partnership with an address of 65 Permanent School Road, Erwinna, Pennsylvania 18920. HanMar is a citizen of Pennsylvania as all of its partners are citizens of Pennsylvania.

12. At all times relevant hereto, EIS was a Georgia corporation with a principal place of business located at 2018 Powers Ferry Road, Suite 500, Atlanta, Georgia 30339. EIS was a citizen of Georgia.

13. Legacy is a Delaware limited liability company with a principal place of business located at 2018 Powers Ferry Road, Suite 500, Atlanta, Georgia 30339. Upon information and belief, none of Legacy's members are citizens of Pennsylvania.

14. Buyer is a Delaware limited liability company with a registered agent, the Corporation Trust Company, located at 1209 Orange St., Wilmington, Delaware 19801. Upon information and belief, none of Buyer's members are citizens of Pennsylvania.

15. Audax Management is a Delaware limited liability company with a registered agent, the Corporation Trust Company, located at 1209 Orange St., Wilmington, Delaware

19801.  Upon information and belief, none of Audax Management's members are citizens of Pennsylvania.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this litigation pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interests and costs, and there is complete diversity between Plaintiffs and Defendants.

17.     Venue is proper in this district under 18 U.S.C. § 1391 because this District is where the subject property is located and a substantial part of the events giving rise to this action have occurred.

## FACTS

### Landlord Leases Industrial Property to Cobra Pursuant to a Written Lease Agreement and Addenda

18.     On September 5, 1995, Landlord and Cobra entered into a lease agreement for approximately 46,600 square feet of industrial and office space situate at 2930 Turnpike Drive, Hatboro, Pennsylvania 19040 (the "Premises").  A true and correct copy of the lease is attached hereto as **Exhibit 1**.[2]

19.     The original lease term was five years, beginning April 1, 1996 and terminating March 31, 2001.  The parties renewed the Lease several times to extend the term which ended on March 31, 2017.

20.     Pursuant to § 6 of the Lease, Cobra was responsible for all repairs and maintenance of the Premises, as follows:

---

[2] Landlord and Cobra had entered into a prior lease, dated March 11, 1991.

> **Except as set forth in Paragraph 6.B. hereof or otherwise set forth herein, Lessee shall be responsible for all maintenance to the Premises and, at Lessee's sole expense, shall keep the Premises clean and free from all ashes, dirt and other refuse matter; replace all glass windows, doors, etc., broken; keep all waste and drain pipes open; repair all damage to plumbing and to the Premises in general; keep the same in good order and repair as they are now, reasonable wear and tear and damage by fire or other casualty alone excepted.  The Lessee agrees to surrender the Demised Premises in the same condition in which Lessee has herein agreed to keep the same during the continuance of this Lease.**
>
> \* \* \*
>
> **In the performance of its obligation to repair and maintain the Premises as set forth above, Lessee, at Lessee's sole cost and expense, shall make all necessary or appropriate repairs, replacements, renewals, and additions, nonstructural, ordinary and extraordinary, foreseen and unforeseen, required to keep and maintain the Premises and all systems, equipment and apparatus appurtenant thereto or used in connection therewith in good order and condition.**

Ex. 1 at § 6A (ii).  [Emphasis added.]

21. The exceptions listed in § 6B concern the roof, structural repairs, and certain common elements that are not at issue in this litigation.  *Id*. at § 6B.

22. Further, Cobra was obligated to make repairs in accordance with all applicable laws and building codes, as follows:

> **Any repairs, replacements, renewals, and additions, and any labor performed or materials furnished in, on or about the Premises shall be performed and furnished by Lessee in strict compliance <u>with all applicable laws, regulations, ordinances and requirements</u> of all duly constituted municipal authorities or other governmental bodies having jurisdiction over the Premises and the requirements of any board of underwriters having jurisdiction thereover.  All material used to repair, replace and renew shall be of equal quality to replaced material in the Premises and meet the same specifications of replaced material.**

Ex. 1 at § 6A(ii) [Emphasis added].

5

23. Cobra was permitted under the Lease to make "additional alterations, additions, or improvements to the interior the [Premises] (hereinafter called 'Interior Improvements')…" Ex. 1 at § 24A.

24. However, those Interior Improvements were required to be removed at the expiration of the Lease term, as follows:

> Lessee shall, at the expiration or earlier termination of this Lease, or any renewal term, remove all such Interior Improvements, and Lessee shall, at its sole cost and expense, return the Premises to their condition as of the Commencement Date of this Lease, reasonable wear and tear and damage by fire or other casualty alone excepted…In the event Lessee shall fail to remove said Interior Improvements and restore the Premises as herein provided, [Plaintiffs] shall have the right to go upon the Premises and do so, and Lessee agrees to pay the cost thereof, together with a twenty-one percent (21%) charge on the total cost to cover Lessor's expense and overhead, as additional rent.

Ex. 1 at § 24 D.

25. At the expiration of the lease term, Cobra was required to "surrender the Premises to [Landlord] in good order and condition, broom clean, reasonable wear and tear and damage by fire or other casualty alone excepted." Ex. 1 at § 27.

26. After the Lease was signed, Cobra occupied the Premises.

27. On February 1, 2001, Plaintiffs and Cobra entered into a written addendum to the Lease, Addendum #1, extending the lease term for another five years and modifying, *inter alia*, the rental payments. A true and correct copy of Addendum #1 is attached hereto as **Exhibit 2**.

28. That same year, on June 1, 2001, Landlord and Cobra entered into Addendum #2, further modifying the rental payments. A true and correct copy of Addendum #2 is attached hereto as **Exhibit 3**.

29. The lease term was extended again in 2006. Landlord and Cobra entered into Addendum #3, extending the lease term to March 31, 2012. A true and correct copy of Addendum #3 is attached hereto as **Exhibit 4**.

30. On January 18, 2012, Landlord and Cobra entered into Addendum #4, extending the lease term to March 31, 2017 and assigning Cobra's obligations under the Lease to EIS. A true and correct copy of Addendum #4 is attached hereto as **Exhibit 5**.

31. Pursuant to Addendum #4, Cobra "assign[ed] its rights and delegate[d] its obligations under the Lease to [EIS]." Ex. 5 at § E. EIS "accept[ed] the assignment of the Lease and assume[d] the obligations of [Cobra] under the Lease. From and after the Effective Date, all references in the Lease to 'Lessee' shall mean [EIS]." *Id.* at § F.

32. Addendum #4 modified Section 25A(ii) of the Lease and allowed Landlord to treat EIS as a holdover tenant if EIS failed to vacate the Premises by March 31, 2017, as follows:

> It is hereby mutually agreed that this Lease shall terminate absolutely on the Lease Termination Date of [March 31, 2017] or any Renewal Term or Extension Term without the necessity of written notice from one party to another. In the event Lessee shall not…have vacated the…Premises at the end of the then current term,…then it is expressly agreed that Lessor shall … treat Lessee as Holding Over in accordance with the revised [Section] 39 of this Lease. (*See* Paragraph 10 of this Addendum #4)."

*Id.* at § 4 (modifying § 25 of the Lease).

33. Paragraph 10 of Addendum #4 further provides that "[a]ll powers granted to Lessor by this Lease shall be exercised and all obligations imposed upon Lessee by this Lease shall be performed by Lessee as well during any Holding Over…". *Id.* at § 4.

34. Furthermore, Addendum #4 modified Section 39 of the Lease and provided that if EIS failed to restore the Premises, it would be deemed that EIS retained possession of the Property and would be subject to continued rent, as follows:

7

> If Lessee remains in possession of the Premises (including failure to restore the same to the condition required hereunder being deemed to constitute possession of the Premises), … such Holding Over shall create a Holding Over tenancy from month to month, commencing on the day after the Lease Termination Date (the "Holdover Term"), with respect to the Premises on all of the same terms and conditions as are in effect on the last day of the preceding term, except that the monthly installment of Minimum Annual Rent in effect on the last day of the preceding term (the "Holdover Rent"). Notwithstanding anything set forth to the contrary, … Holdover Rent shall accrue and shall be payable by Lessee until such time ("Restoration Date") as Lessee vacates fully the Premises and restores the same to the condition required hereunder.

Ex. 5 at § 10 (modifying § 39 of the Lease).

35. Sections 6, 24, and 27 (quoted above) were not modified by Addendum #4. EIS and Landlord specifically agreed that "the terms and conditions of the Lease not inconsistent with the terms hereof are hereby ratified and confirmed and shall remain in full force and effect during the term of the Lease and all renewals and extensions thereof." Ex. 5 at § 18.

### EIS Breaches the Lease Agreement and Causes Hundreds of Thousands of Dollars of Damages to the Premises

36. The then-current term of the lease terminated on March 31, 2017.

37. It was instantly apparent that EIS neither had maintained the Premises during its occupation nor restored the Premises to the condition required under the Lease.

38. Specifically, EIS caused the following damages to the Premises:

   a. EIS failed to properly maintain and restore the **warehouse concrete floor**. Among other damages to the floor, EIS drilled (and did not repair) holes for steel racking anchors, failed to remove the racking anchors themselves, failed to patch and repair holes and gouges in the floor caused by steel forks on the tow mowers, and failed to clean and re-seal the floor.

   b. EIS failed to properly maintain the office **suspended ceiling system**, including the repair or replacement of all damaged sections of the metal ceiling support system. The ceiling tiles, replaced by EIS were done improperly in that, *inter* alia, the tiles were not "melt away" tiles and, in addition, EIS used tiles which were not compatible in color or appearance with the existing ceiling tiles and some of which were not code compliant.

8

c.  EIS failed to properly clean, maintain, and restore the interior side of the **masonry warehouse walls separating the** adjoining leased units. Among other damages to the walls, EIS failed to regularly clean the walls, failed to remove paint from the walls, failed to remove stenciled lettering from the walls, failed to remove nailed wood from the walls, failed to repair damaged or broken sections of walls, and failed to remove bar code stickers which were affixed to the walls.

d.  EIS failed to properly maintain, repair, and restore the dock seals and **garage doors** and related elements, including failing to repair damaged and dented sections of the garage doors, failing to replace damaged sections of the door seals on the outside portion of the doors, failing to replace damaged and missing rubber seals at the bottom of the doors, failing to repaint rusting garage doors, failing to replace damaged and rusted door bumpers, failing to patch and repair damaged sections of floor at the doors, failing to repair and repaint door lock levelers, and failing to replace damaged and broken sections of masonry wall around the garage doors.

e.  EIS failed to properly maintain, repair, and restore the **front entrance** walks to the Premises, including failing to repair and restore the concrete walks and failing to properly maintain and restore the tile covered entrance walk on which EIS had installed a glue-down outdoor carpet.

f.  EIS failed to properly maintain, repair, and restore various elements of the **plumbing system**, including **damaged toilets, missing drinking fountains, damaged floor cleanouts, malfunctioning hot water heaters, and exposed water lines**.

g.  EIS covered an existing neutral **colored vinyl floor** in two offices (which EIS converted to a kitchen and lunchroom without Landlord's approval) with another vinyl floor that was not of standard color or otherwise appropriate for an office environment, and not approved by Landlord.

h.  EIS failed to properly maintain, repair, and restore all **office partitions and doors**. EIS made numerous holes in the office partitions including those made by the installation of unapproved through-the-wall air conditioning units, pushed sections of the office partitions inward from the warehouse, painted logos, designs, and decorations on the walls incompatible with a normal office environment, and made additional holes in the walls as a result of the installation of a kitchen sink, racking, and other unauthorized installations.

i.  EIS failed to properly maintain, repair, and restore the **partition walls** surrounding the sprinkler room and surrounding the offices.

9

    j. EIS failed to properly maintain, repair, and restore the **HVAC system** to good order and repair. EIS replaced the suspended warehouse furnaces with suspended warehouse heating units which were of a different specification than the existing suspended warehouse furnaces, including ductwork.

    k. EIS caused damage to the front entrance doors and windows by installing **through-the-wall air-conditioning units in certain windows and doors and by sealing some of the doors either by use of caulk or screws**.

    l. EIS changed the **cores for the master key system** for all of the exterior doors serving the Premises.

    m. EIS covered a **wet bed ceramic tile floor** that had existed in the bathrooms of the Premises with glue-down vinyl flooring.

    n. EIS failed to remove various other **Interior Improvements** that they had made to the Premises.

39. Simply stated, EIS breached its obligations under the Lease. It failed to properly repair, maintain and restore the Premises, as it was obligated to do pursuant to Section 6. Ex. 1 at § 6. It also failed to remove the Interior Improvements that it had made, as it was obligated to do pursuant to Section 24. *Id.* at § 24. And it certainly failed to "surrender the Premises to [Plaintiffs] in good order and condition, broom clean, reasonable wear and tear and damage by fire or other casualty alone excepted." *Id.* at § 27.

40. To date, Landlord has spent over $415,000.00 to repair and restore the Premises because of EIS' breaches of the Lease.

41. Until the Landlord completed the restoration of the premises on June 30, 2018, EIS was deemed to be in possession of the Premises pursuant to Paragraph 10 of Addendum #4 which is referenced in Paragraph 34 hereinabove.

42. EIS having been deemed to remain in the possession of the Premises under Paragraph 10 of Addendum #4 has created a "Holding Over" tenancy from month to month, commencing on April 1, 2017 with respect to the Premises on all of the same terms and

conditions except that the monthly installment of rent payable has been increased to $66,987.51 per month.

43. The term of EIS' Holding Over tenancy extended from April 1, 2017 to June 30, 2018, though the amount of rent collected by Landlord (from a replacement tenant for a portion of the Premises) during that term has been credited to EIS in accordance with Paragraph 10 of Addendum #4 (the "Holdover Rent").

44. EIS is in default for, among other reasons, non-payment of the Holdover Rent.

45. **To date, no Defendant has paid any Holdover Rent.  However, Holdover Rent is not at issue in the Arbitration**.

### Plaintiffs File the Arbitration against EIS and Cobra

46. On April 5, 2017, Landlord filed its Demand for Arbitration, naming Cobra and EIS as Respondents.  A true and correct copy of the Demand for Arbitration is attached hereto as **Exhibit 6**.

47. On October 26, 2017, papers were filed with the Pennsylvania Department of State reflecting that Cobra had merged with EIS.

48. EIS represented to Landlord that the filing with the Pennsylvania Department of State was accurate and that Cobra did not maintain a separate identity from EIS.

49. In so doing, EIS assumed all of Cobra's liabilities and any claims Landlord had against Cobra.  Landlord discontinued their claims in the Arbitration against Cobra but maintained their claims against EIS.

50. In early 2019, as the Arbitration wore on (more than 2 years at the time), the arbitrator issued subpoenas duces tecum for the depositions of four of EIS' executives.

51. In addition to ordering the production of documents relating to EIS' failure to maintain, repair, and restore the Premises, the subpoenas required that EIS' executives produce all documents relating to EIS' maintenance, repairs, and restoration of its other leased commercial properties, including any related claims or lawsuits.

52. None of the witnesses appeared for their depositions or produced any documents pursuant to the subpoenas.

### EIS Goes Private and Is Acquired by Audax

53. After the subpoenas were issued, but before any deposition could take place, EIS conducted the Transfers to divest itself of assets and change its corporate form.

54. On September 30, 2019, Audax announced that it had completed its acquisition of EIS. A true and correct copy of the press release is attached hereto as **Exhibit 7**.

55. That same day, EIS filed a Certificate of Conversion with the Georgia Secretary of State reflecting that, in a going-private transaction, EIS had elected to become Legacy, a Delaware limited liability company. A true and correct copy of the Certificate of Conversion is attached hereto as **Exhibit 8**.

56. Legacy has the same office and address as EIS.

57. In the Arbitration, EIS' counsel used the Transfers as an argument to resist complying with the subpoenas. At the same time, EIS offered no details or explanation to Landlord about the Transfers.

58. When Landlord sought to take discovery regarding the Transfers in the Arbitration, EIS opposed Landlord's efforts.

59. However, on December 2, 2019, EIS was ordered by the arbitrator to identify "the buyer and/or the current owner or successor of EIS, Inc." A true and correct copy of the December 2, 2019 Order is attached hereto as **Exhibit 9**.

60. On December 9, 2019, in an email to comply with the order, EIS' counsel wrote that "…we have listed below the information related to the purchaser of EIS, Inc.:

>EIS Buyer, LLC
>c/o Audax Management Company, LLC
>101 Huntington Avenue
>Boston, MA 02199

A true and correct copy of EIS counsel's December 9, 2019 email is attached hereto as **Exhibit 10**.

61. This email was the extent of EIS' disclosure to Landlord regarding the Transfers and it was only done because it was ordered by an arbitrator.

62. In the same email, EIS' counsel reiterated their position that Landlord should not be given the information about the Transfers because it was "not relevant" to its claims against EIS. *See* Ex. 10.

**63. Landlord filed a motion to add Legacy, Buyer, and Audax as parties to the Arbitration. EIS opposed the motion and it was denied by the arbitrator.**

64. The Arbitration is proceeding solely against EIS, despite the fact that EIS has been sold and apparently exists in name only as a shell and has divested itself of its assets.

65. Upon information and belief, the Transfers have caused the sum total of EIS' debts to be greater than the sum of its assets.

### Despite the Transfers, EIS Continues Operations

66. Despite the Transfers, the successor/alter ego Defendants are carrying out operations in EIS' name and using its former assets.

67. Defendants use the same Georgia office to carry out EIS' operations.

68. Defendants continue to employ some of the same officers of EIS.

69. Defendants use the same EIS website. In fact, even though EIS is no longer registered with the Georgia Secretary of State, the website was still copyrighted by "EIS, Inc." in 2020. *See* Home Page of EIS, https://www.eis-inc.com, last visited July 17, 2020.

70. Defendants use the name "EIS, Inc" and benefit from all of the goodwill and other intangibles associated with it. The goodwill built up from a "legacy of strength and stability" is one of the selling points on the website. *See* EIS, *Our Company*, https://www.eis-inc.com/our-company, last visited July 17, 2020.

71. From all outward appearances, nothing has changed at EIS. Defendants have concealed the Transfers in order to seamlessly continue EIS' operations.

72. However, if Landlord obtains a judgment against EIS, Landlord would likely be unable to collect from EIS as the it no longer exists in that form and likely has no assets.

**COUNT I: BREACH OF CONTRACT**
(Plaintiffs against all Defendants except EIS)

73. Landlord incorporates all the foregoing paragraphs by reference as if set forth at length herein.

74. Landlord and Cobra entered into the Lease.

75. EIS assumed all of Cobra's obligations under the Lease pursuant to Addendum #4 and by virtue of EIS' and Cobra's merger.

76. EIS materially breached the terms of the Lease by failing to properly maintain, repair, and restore the Premises.

77. Furthermore, EIS materially breached the terms of the Lease by failing to pay Holdover Rent.

14

78. Landlord performed its duties and obligations in accordance with the terms of the Lease.

79. As a result of EIS' breaches, Landlord has suffered damages.

80. Legacy, Buyer, and Audax are successor entities to EIS and have assumed EIS' liabilities, including liability arising from EIS' breach of the Lease and failure to pay Holdover Rent.

**WHEREFORE**, Landlord respectfully requests the Court to enter judgment in its favor and against Defendants for compensatory damages, in excess of $75,000.00, including direct and consequential, reasonable attorneys' fees pursuant to the Lease, pre and post judgment interest and such other and further relief as is warranted under the premises.

### COUNT II: PENNSYLVANIA'S UNIFORM VOIDABLE TRANSACTION ACT, 12 PA.C.S. §§ 5104-5105
(Landlord against all Defendants)

81. Landlord incorporates all the foregoing paragraphs by reference as if set forth at length herein.

82. Landlord has claims against Defendants and is a creditor of Defendants.

83. Defendants engaged in the Transfers with the actual intent to hinder, delay, or defraud any of its creditors, including Landlord.

84. Prior to the Transfers, Landlord had filed Arbitration against EIS. Moreover, discovery had been ordered in the Arbitration that would have laid bare EIS' business practices regarding this and its other leased properties, including any claims and lawsuits associated with those properties.

85. After the Transfers, Defendants continue to use the name "EIS, Inc." to continue operations, concealing the effect of the Transfers and allowing EIS and/or Legacy to retain possession and control of the assets.

86. Furthermore, Defendants, through their agents, have actively attempted to conceal the Transfers from creditors by refusing to provide any details of the Transfers in the Arbitration.

87. Upon information and belief, one or more of the Transfers resulted in a transfer of substantially all of EIS' and/or Legacy's assets.

88. Upon information and belief, EIS and/or Legacy were rendered insolvent by one or more of the Transfers.

89. Upon information and belief, Defendants made one or more of the Transfers without receiving reasonably equivalent value in exchange.

***INTENTIONALLY LEFT BLANK***

**WHEREFORE**, Landlord respectfully requests the Court to enter judgment in its favor and against Defendants for an order voiding the Transfers, compensatory damages, in excess of $75,000.00, including direct and consequential damages, reasonable attorneys' fees pursuant to the Lease, pre and post judgment interest and such other and further relief as is warranted under the premises.

Respectfully submitted,

**BRAVERMAN KASKEY GARBER, P.C.**

Dated: August 21, 2020    BY:    */s/ David L. Braverman*
DAVID L. BRAVERMAN, ESQUIRE
KEVIN W. BURDETT, ESQUIRE
One Liberty Place - 56th Floor
1650 Market Street
Philadelphia, PA 19103
Telephone: (215) 575-3800
Facsimile: (215) 575-3801
braver@braverlaw.com
burdett@braverlaw.com

*Attorneys for First Investors Nevada Realty, LLC, as agent for First Investors Nevada Realty Trust, assignee of Mark Hankin*

**UNRUH TURNER BURKE & FREES**

BY:    */s/ John K. Fiorillo*
JOHN K. FIORILLO, ESQUIRE
17 West Gay Street
P.O. Box 515
West Chester, PA  19380
Telephone: (610) 692-1371
jfiorillo@UTBF.com

*Attorneys for Hanmar Associates, MLP*